STERLING BREWING, Inc. v. COLD SPRING BREWING CORP.

Civ. A. No. 50–233.

United States District Court
D. Massachusetts.

July 2, 1951.

Richard F. Walker, Boston, Mass., Francis C. Browne, Jewett, Mead & Browne, Washington, D. C., for plaintiff.

Cedric W. Porter, Boston, Mass., for defendant.

McCARTHY, District Judge.

1. This is an action for trade-mark infringement and unfair competition. The plaintiff has waived an accounting for damages.

2. The plaintiff is a corporation organized under the laws of Indiana, having its usual place of business in Evansville, Indiana. Its business was founded prior to 1894 when it was taken over by plaintiff's immediate predecessor in business, the Evansville Brewing Association, an Indiana corporation.

3. The Evansville Brewing Association adopted the "Sterling" mark for beer prior to 1895 and had actual and exclusive use of "Sterling" as a trade-mark for beer, with such use including interstate use, until subsequent to 1905.

4. The plaintiff was incorporated in 1917 under the name of Sterling Products Company, and in 1919 acquired all the assets of its predecessor, including its trade and trade-mark rights in, to and under said mark "Sterling" for beer, together with the attending good will, and thereafter plaintiff continued said business with its activities including until 1933 the production of "near beer" under the mark "Sterling".

5. From the early 1880's until the advent of Prohibition a concern, Reuter & Company, was engaged in Boston, Massachusetts, in the production of ale which it sold solely within the New England States under the mark "Sterling".

6. From some time in 1900 until in or about November of 1907 another concern, Worcester Brewing Corporation, with a place of business in Worcester, Massachusetts, was engaged in the production and sale of ale which it sold within the New England States under the mark "Worcester Sterling Ale".

7. Shortly after the advent of Prohibition Reuter & Company liquidated and terminated its business activities. Neither Reuter & Company nor Worcester Brewing Corporation was at any time engaged in the manufacture or sale of beer.

8. In pre-Prohibition days ale and beer were substantially different in character, and the uniform practice was for one product to be produced and sold by certain brewing concerns from their breweries and for the other product to be produced and sold by different brewery concerns. Following repeal of Prohibition, ale and beer became so close in character that it has become a well-known practice to have both products produced in the same brewery and to have both sold by the brewer under single trade-mark.

9. Upon the repeal of Prohibition the plaintiff in 1933 resumed its production and sale in interstate commerce of beer under the "Sterling" mark, and has continued such production and sale continuously to date. In late 1934 the plaintiff expanded its business to include the production and sale of ale which had not previously been made or sold by it, and since late 1934, except for a short period of inactivity during World War II, plaintiff has continued the sale of its ale under the "Sterling" mark.

10. The plaintiff under Section 5 of the Trade-Mark Act of 1905, now 15 U.S. C.A. § 1052, secured September 26, 1933, its registration of "Sterling" for beer, since which date the plaintiff has been the owner of the registration, No. 306,673.

11. During the prosecution of the application therefor the plaintiff's President Richard T. Riney represented as the basis for the registration that through the ten years preceding 1905 its use of the "Sterling" mark had been exclusive as to *beer*. This representation was true and accurate. There appears to have been no fraud in the procurement of this registration.

12. Following the commencement of its manufacture and sale of ale under the mark "Sterling", and after more than one year's exclusive use of the mark as applied to ale, the plaintiff secured its "extension" registration, No. 332,040, January 28, 1936, of "Sterling" for ale under the 1920 amendment to Section 5 of the Act of 1905.

13. The plaintiff's registrations Nos. 306,673 and 332,040 were duly republished pursuant to Section 12(c) of the Trade Mark Act of 1946, 15 U.S.C.A. § 1062(c), on May 18, 1948.

14. Plaintiff is also the owner of registrations No. 394,670, April 21, 1942 for ale, and No. 394,929, May 5, 1942 for beer, both of which have been republished under the Act of 1946.

15. The plaintiff (the term is meant to include its predecessor in business) has confined its principal activities with respect to the distribution and sale of beer and ale under its "Sterling" mark to the States of Indiana, Illinois, Kentucky, Ohio, Tennessee, Virginia, North Carolina, Florida, Georgia, Mississippi, Alabama, Louisiana and Arkansas. The further a sales ter-

ritory is located from the site of the brewery, the smaller are the sales. In Indiana, for example, the plaintiff makes one-third to one-half its annual sale by volume (approximately 175,000 barrels in the last year) while in Virginia, Florida, Georgia, Mississippi, Louisiana and Arkansas, last year's sales amounted to only two to four hundred barrels in each State.

16. In 1950 the plaintiff made very small sales in New Hampshire, Massachusetts and Rhode Island, each shipment being ten to fifteen cases, and there being but three or four shipments.

17. I find that the plaintiff's zone of potential expansion of business cannot reasonably be expected to extend to New England. The plaintiff now covers the outlying States of its sales territory very lightly. To come into New England from the South the plaintiff would have to cover Maryland, Pennsylvania, Delaware, New Jersey and New York before reaching the borders of New England. From the West the plaintiff would have to cover that portion of Ohio east of Dayton, Pennsylvania and New York. Despite the alleged "intentions" of the plaintiff, its President admits that he has taken no active steps toward expansion into the northeastern section of the country. He testified that he talked about possibly buying a brewery in New Bedford, Massachusetts, but the talk did not progress to actual negotiations.

18. Since 1933 the plaintiff has expended approximately four and a half million dollars for advertising its products, using the media of newspaper advertisements, radio programs, outdoor posters or billboards, signs and display advertising at points of sale. One type of advertising which has reached potential customers in New England has been advertisements in Indianapolis, Nashville, Atlanta, Birmingham, Memphis, Terra Haute, Evansville, Louisville and Chicago newspapers. At best, as conceded by the plaintiff, each of these newspapers has about a dozen individual subscribers in the Boston area (some as few as one or two) and a smaller and scattered circulation in the rest of New England. "Point of sale" advertising has accompanied the aforementioned small 1950 sales of plaintiff's products in Massachusetts, New Hampshire and Rhode Island.

19. During World War II, some 15% of the plaintiff's "Sterling" products were sold to the armed forces in camps, throughout the Mid-West. The Court takes judicial notice of the fact that New Englanders, both in and out of the Armed Forces, spent some time within the Mid-West during that period.

20. I find that the plaintiff's "Sterling" mark has not acquired a secondary meaning in Massachusetts and New England as indicative of the plaintiff and its products.

21. The defendant, a Massachusetts corporation, was incorporated in September of 1947, and is the successor to the Cold Spring Brewing Company which has conducted a business of brewing since 1895. In the course of that time it had sold its products under the marks "Cold Spring", "Amberlite", "5X" and "Hacker's".

22. In the early fall of 1949 the defendant's president, Mr. Richmond, had actual knowledge of the plaintiff's use of the mark "Sterling" for ale in the Mid-Western States.

23. On November 10, 1949, the defendant posted the brand name "Hacker's Sterling Ale", and the price at which the product bearing the mark would be sold, with the Massachusetts Alcoholic Beverage Commission.

24. On November 17, 1949, the plaintiff served written notice on the defendant of its "Sterling" registrations and of a "plan to expand" its "Sterling" trade into New England.

25. On November 21, 1949, the plaintiff filed an application for registration of the mark "Sterling" for beer and ale on the Principal Register under the Trade-Mark Act of 1946, 15 U.S.C.A. § 1051 et seq., which resulted in Registration No. 526,392, June 13, 1950. This registration is under the provisions of Section 2(f), for registration of a descriptive word which has become "distinctive of the applicant's goods in commerce". Through the five years

next preceding the filing date, the plaintiff had had substantially exclusive and continuous use of "Sterling" as its trade-mark for ale and beer in interstate commerce.

26. On December 9, 1949, the defendant made its first sale of "Hacker's Sterling Ale" in Massachusetts. The first interstate shipment was to Portland, Maine, on December 16, 1949.

27. The defendant made no special product for its "Sterling" mark but applied the said mark to the same ale which it had been selling as "Amberlite".

28. The plaintiff's first sales in New England were made on or subsequent to January 3, 1950.

29. The defendant's mark is confusingly similar to that of the plaintiff. The resemblance is such as to deceive the ordinary purchaser. The only difference between the two is the name "Hacker's" in the mark of the defendant. The dominant part of the mark is the word "Sterling", as was intended and admitted by the defendant through its president who testified that he considered "Sterling" to be an old New England tradition as a mark, and that the defendant corporation aspired to become known eventually as the "Sterling Brewing" Company.

As pleaded in the first paragraph of this complaint, the jurisdictional basis is threefold: (1) 28 U.S.C.A. § 1332, diversity of citizenship and requisite amount in controversy; (2) 15 U.S.C.A. § 1121, Sec. 39 of the Trade-Mark Act of 1946, on which the plaintiff places its main reliance as the basis of its statutory registration rights; against unfair competition.

The word "sterling", of course, is descriptive. It is descriptive of quality, however, not directly descriptive of ale, and the meaning is such that need not be used in connection with ale except for some special purpose such as for indication of origin. Worcester Brewing Corp. v. Rueter & Co., 1 Cir., 157 F. 217. This is the use to which the plaintiff put the term. Its sales and advertising under the mark have been such that for many years, its "Sterling" mark has become and is distinctive of the plaintiff's goods in commerce, has acquired public recognition and secondary meaning as indicative of the plaintiff and its beer and ale, with said distinctiveness, recognition and secondary meaning confined primarily to the plaintiff's market in the Mid-Western States.

That the defendant's mark infringes is clear. The only difference, as hereinbefore stated, between the two is the use of the name "Hacker's" preceding the word "Sterling" in the defendant's mark. The mere use of a name in connection with the trade mark of another is not enough of itself to obviate misappropriation. Little Tavern Shops, Inc. v. Davis, 4 Cir., 116 F. 2d 903; Bunte Bros. v. Standard Chocolates, Inc., D.C., 45 F.Supp. 478, 481.

To the extent that the plaintiff's case is based on common law rights, his rights are governed by the law of Massachusetts, and it is settled that under such law the rights are not protected beyond the territory where the plaintiff's goods are sold, where he has no customers and where he has no trade. Kaufman v. Kaufman, 223 Mass. 104, 111 N.E. 691; Staples Coal Co. v. City Fuel Co., 316 Mass. 503, 511, 55 N.E.2d 934. The plaintiff relies upon Mass. G.L.(Ter.Ed.) c. 110, § 7A, as added by St. 1947, c. 307, under which a plaintiff is entitled to injunctive relief on the basis of "likelihood of injury to business reputation or of dilution of the distinctive quality of a trade name or trade-mark". The statute was passed to permit injunctive relief in cases of trade-mark infringement or unfair competition notwithstanding the absence of competition between the parties or of confusion as to source of goods or services. Food Fair Stores, Inc. v. Food Fair, Inc., D.C., 83 F.Supp. 445. Where, however, as here, the plaintiff's mark has not acquired a secondary meaning in Massachusetts, as indicative of the plaintiff, the plaintiff's rights are not enlarged by the statute. Mann v. Parkway Motor Sales, Ind., 324 Mass. 151, 85 N.E.2d 210. The plaintiff must find the protection it seeks under Federal law.

The defendant has averred that the plaintiff's registrations are invalid and void, having been granted "improperly and im-

providently". Registration No. 306,673 was filed January 23, 1933 for malt products, "especially beer" in Class 48, malt beverages and liquors. The amended application of the plaintiff for this registration contains the sworn statement: "The mark has been in actual use as a Trade Mark by applicant and its predecessors from whom title was derived for ten years next preceding February 20, 1905, and such use has been exclusive". This, asserts the defendant, was a false statement, knowingly made, because of the well-known Reuter and Worcester Brewing uses in New England. See Worcester Brewing Corp. v. Rueter & Co., supra.

■ It appears, however, as noted hereinbefore, that up to 1933 beer was sufficiently different from ale to entitle the plaintiff to its ten-year proviso registration for beer, and no invalidity results from the parallel uses of Reuter and Worcester of "Sterling" on ale through the ten years preceding 1905. Furthermore, I find that there was no concealment by the plaintiff of the early uses of "Sterling" on ale. The file wrapper history of the plaintiff's basic 1933 registration (P.Ex. 17A) shows that the applicant took affirmative action in calling the attention of the Patent Office to the decisions involving the Reuter and Worcester companies. The argument that the goods recital in the 1933 registration "malt products"—namely beer, includes ale and that therefore the Reuter and Worcester uses precluded a valid registration, ignores the principle that a specific recital limits the generality of an accompanying general recital except as an intent to the contrary is expressed. S. C. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427.

The plaintiff validly extended its registration rights to ale in 1936 with Registration No. 332,040, a ten-year proviso expansion registration under Sec. 5 of the Trade-Mark Act of 1905, as amended by the Act of 1920. The plaintiff did not make ale until 1934 and had more than a year's exclusive use on ale before its 1936 registration. On the basis of the foregoing the plaintiff was further entitled to Registra-

tions No. 394,670 and No. 394,929 in 1942. All four became entitled to the benefits of the Lanham Act with their republication in 1948.

■ Plaintiff's Registration No. 526,392 is a registration under Sec. 2(f) of the Lanham Act, which permits registration of a mark "which has become distinctive of the applicant's goods in commerce". "The mark (Sterling) is claimed to have become distinctive of the applicant's goods in commerce which may lawfully be regulated by Congress through substantially exclusive and continuous use thereof as a mark by the applicant in commerce among the several States for the five years next preceding the date of the filing of this application". By Sec. 2(f) this five year use, prior to the critical filing date of November 21, 1949 is made prima facie evidence that the mark has become distinctive. The fact of such use was proved at trial. This registration is valid.

The defendant presses the argument that it is "settled law that trade-mark rights do not extend beyond the territory in which a mark is used, the registrant's zone of reputation and probable expansion. This is true at common law, of registration under the 1905 Act and under the 1946 Act". The defendant cites the leading cases of Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; and Griesedieck Western Brewery Co. v. Peoples Brewing Co., 8 Cir., 149 F.2d 1019.

The contention here that the territory in which the plaintiff has established its trade is remote from the territory in which the defendant is using its mark is well founded. At least until the adoption of the Trade-Mark Act of 1946 the courts have accepted the principle that is only where the trade goes attended by the use of the mark that the owner of the mark will be given protection against the sale by another of his product labeled similarly in good faith. One fact, however, stands out here. The defendant had actual knowledge of the prior use of the mark "Sterling" by the

418

plaintiff, and knowledge of the plaintiff's registrations.

■ I am of the opinion that the provisions of the Act of 1946 negative the defense of "territorial limitation" of the protection accorded to a registered trade-mark, and that the plaintiff is entitled to injunctive relief irrespective of the plaintiff's "expansion situation".

Sec. 32(1) of the Act of 1946, 15 U.S. C.A. § 1114(1), provides: "Any person who shall, in commerce, (a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services * * * shall be liable to a civil action by the registrant * * *".

Sec. 22 of the Act, 15 U.S.C.A. § 1072, provides that: "Registration of a mark on the principal register provided by this Act or under the Act of March 3, 1881, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof".

With respect to this last-quoted section, the commentary on the Act by Daphne Robert, to be found in 15 U.S.C.A., introductory to Chapter 22, is illuminating. "It should be noted that any use of a mark commencing after July 5, 1947 is not a lawful use if the same mark was previously registered by another under the Act of 1881 or the Act of 1905 and such other person continues to use it. This result obtains because on and after July 5, 1947, the registrations are constructive notice of ownership and a second user cannot claim that he adopted and used the mark in good faith and without knowledge of the prior use. * * *" Page 272. Under the subtitle "VII. Effect of Registration" it is stated: "The greatest single advantage of a principal registration is that it is constructive notice of the registrant's claim of ownership of the mark. This means simply that so long as a mark remains on the principal register, everyone is charged with notice of the claim of ownership * * *. It means that such use is an unlawful use and cannot be justified by a claim of innocence, good faith or lack of knowledge. Its practical effect is to give *nation-wide effect* to a principal registration, providing notice to intrastate users as well as others, and thereby eliminating one of the weaknesses inherent in prior statutes". The same author in the "New Trade Mark Manual", 1947 sums up the situation as follows: "* * * This answers the question so often asked: 'What does my registration give me?' Up to now, there was good reason for asking the question, and lawyers and judges were frequently hard put to find a satisfactory answer * * *. Its practical effect is to give nationwide coverage to a Federal registration * * *. (It provides a sense of security to the registrant by preserving for him the right to expand his market at a later date without fear of having had it usurped by a newcomer. The prior laws did not enlarge the common law, but the common law to this extent is now supplanted by the statute." Pp. 129, 130.

Counsel may prepare judgment granting injunctive relief to the plaintiff in accordance with the foregoing.

It follows, and I rule, that the defendant's counterclaim must be dismissed.